Richard R. Barker
Acting United States Attorney
Eastern District of Washington
Stephanie Van Marter
Caitlin Baunsgard
Assistant United States Attorney
Post Office Box 1494
Spokane, WA  99210-1494
Telephone: (509) 353-2767

FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAY 2 2 2025

SEAN F. MCAVOY, CLERK
_____, DEPUTY
YAKIMA, WASHINGTON

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOSE CARLOS MENDOZA SANCHEZ,

Defendant.

Case No. 4:23-CR-6027-RLP

PLEA AGREEMENT

Fed. R. Crim. P. 11(c)(1)(C)

Plaintiff United States of America, by and through Richard R. Barker, Acting United States Attorney for the Eastern District of Washington, and Stephanie Van Marter and Caitlin Baunsgard, Assistant United States Attorneys for the Eastern District of Washington, and Defendant, JOSE CARLOS MENDOZA SANCHEZ ("Defendant"), both individually and by and through Defendant's counsel, Nick Mirr, agree to the following Plea Agreement:

1.    Guilty Plea and Maximum Statutory Penalties:

Defendant agrees to enter a plea of guilty to Count 1 of the Superseding Indictment filed December 5 , 2023, charging him with Conspiracy to Distribute 5 Kilograms or more of Cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii), 846.

PLEA AGREEMENT - 1

Defendant understands that the following potential penalties apply:

      a.     a term of imprisonment of not less than 10 years no more than life;

      b.     a term of supervised release of not less than 5 years and up to a lifetime;

      c.     a fine of up to $10,000,000;

      d.     denial of federal benefits; and

      e.     a $100 special penalty assessment.

2.    <u>Supervised Release</u>

Defendant understands that if Defendant violates any condition of Defendant's supervised release, the Court may revoke Defendant's term of supervised release, and require Defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post-release supervision, up to the following terms:

      a.     5 years in prison if the offense that resulted in the term of Supervised Release is a class A felony,

      b.     3 years in prison if the offense that resulted in the term of Supervised Release is a class B felony, and/or

      c.     2 years in prison if the offense that resulted in the term of Supervised Release is a class C felony.

Accordingly, Defendant understands that if Defendant commits one or more violations of supervised release, Defendant could serve a total term of incarceration greater than the maximum sentence authorized by statute for Defendant's offense or offenses of conviction.

3.    <u>Denial of Federal Benefits</u>:

Defendant understands that by entering this plea of guilty, Defendant may no longer be eligible for assistance under any state program funded under part A of Title IV of the Social Security Act (concerning Temporary Assistance for Needy Families)

PLEA AGREEMENT - 2

or benefits under the food stamp program or any state program carried out under the Food Stamp Act. 21 U.S.C. § 862a. Defendant also understands that the Court may deny Defendant's eligibility for any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States. 21 U.S.C. § 862.

4.     Potential Immigration Consequences of Guilty Plea

If Defendant is not a citizen of the United States, Defendant understands the following:

a.     pleading guilty in this case may have immigration consequences;

b.     a broad range of federal crimes may result in Defendant's removal from the United States, including the offense to which Defendant is pleading guilty;

c.     removal from the United States and other immigration consequences are the subject of separate proceedings; and

d.     no one, including Defendant's attorney or the Court, can predict with absolute certainty the effect of a federal conviction on Defendant's immigration status.

Defendant affirms that Defendant is knowingly, intelligently, and voluntarily pleading guilty as set forth in this Plea Agreement, regardless of any immigration consequences that Defendant's guilty plea may entail.

5.     The Court is Not a Party to the Plea Agreement:

The Court is not a party to this Plea Agreement and may accept or reject it. Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will impose in this matter.

Defendant understands the following:

a.     sentencing is a matter solely within the discretion of the Court;

b.     the Court is under no obligation to accept any recommendations made by the United States or Defendant;

PLEA AGREEMENT - 3

c.    the Court will obtain an independent report and sentencing recommendation from the United States Probation Office;

d.    the Court may exercise its discretion to impose any sentence it deems appropriate, up to the statutory maximum penalties;

e.    the Court is required to consider the applicable range set forth in the United States Sentencing Guidelines, but may depart upward or downward under certain circumstances; and

f.    Defendant understands that this Plea Agreement contains sentencing recommendations pursuant to Fed. R. Crim. P. 11(c)(1)(C). As a result, the United States may withdraw from this Plea Agreement if the Court imposes a lesser sentence than agreed upon, and Defendant may withdraw from this Plea Agreement if the Court imposes a harsher sentence than agreed upon.

6.    <u>Waiver of Constitutional Rights</u>:

Defendant understands that by entering this plea of guilty Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

a.    The right to a jury trial;

b.    The right to see, hear and question the witnesses;

c.    The right to remain silent at trial;

d.    The right to testify at trial; and

e.    The right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands Defendant retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if Defendant cannot afford to hire an attorney.

Defendant understands and agrees that any defense motions currently pending before the Court are mooted by this Plea Agreement, and Defendant expressly waives Defendant's right to bring any additional pretrial motions.

PLEA AGREEMENT - 4

7.    Elements of the Offense:

The United States and Defendant agree that to convict Defendant of Count 1, the United States would have to prove beyond a reasonable doubt the following elements:

First, on a date unknown but by January 2022 and continuing until on or about September 14, 2023, in the Eastern District of Washington, Defendant, JOSE CARLOS MENDOZA SANCHEZ, entered into an agreement with one or more persons to commit the crime of Distribution of Cocaine, as charged in the Superseding Indictment;

Second, Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, the agreement was to distribute 5 kilograms or more of cocaine, each of which was reasonably foreseeable to Defendant as a member of the conspiracy.

8.    Statement of Facts:

The United States and Defendant stipulate and agree to the following: the facts set forth below are accurate; the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for Defendant's guilty plea.

The United States and Defendant agree that this statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts that are relevant to the Sentencing Guidelines computation or sentencing, unless otherwise prohibited in this Plea Agreement.  The parties further agree and stipulate that this factual basis is simply a summary to support the plea, it does not contain all facts which could be proven by the United States.

In the summer of 2018, the FBI Safe Street Task Force in Tri-Cities, Washington (FBI SEWSSTF) became aware of Jose DeJesus MEDINA Acevedo (aka "Chuy") ("MEDINA") as the head of a drug trafficking organization ("DTO")

PLEA AGREEMENT - 5

operating in the Eastern District of Washington ("EDWA") and elsewhere. MEDINA was the owner of "Chuy's Auto Sales" at 224 N Washington St, Kennewick, WA, and was identified as being responsible for the transport of multiple kilogram-quantities of cocaine from California to the EDWA and elsewhere. Approximately a dozen federal tracking warrants and pen registers were ultimately granted involving members of this DTO. During this time, there were several individuals identified as working for MEDINA, to include Defendant JOSE CARLOS MENDOZA SANCHEZ (aka "Carteezy") ("MENDOZA"). There were also several enforcement operations that resulted in the seizure of large quantities of cocaine.

At the end of 2018 to early 2019 timeframe, MEDINA shut down "Chuy's Auto Sales" and relocated to "Elite 1 Auto Sales" at 800 W Columbia Dr., also in Kennewick. MEDINA was observed frequenting "Elite 1 Auto Sales" on multiple occasions by law enforcement surveillance. In the beginning of 2021, MEDINA was seldom observed at his identified residence, 6405 Turf Paradise Dr., Pasco, WA, and by February 2022, the Pasco residence was reported as sold. MEDINA reportedly purchased property in California.

*MEDINA Returns to the EDWA*

In late 2022, a Confidential Human Source ("CHS1") identified MEDINA as a major trafficker of cocaine that was coming back to Tri-Cities area from California. CHS1 stated they had known MEDINA and MEDINA's family for years. CHS1 stated when MEDINA still owned "Chuy's Auto Sales" he used undocumented immigrants to transport drugs using cars with hidden compartments from California to Washington who he paid $1,000 per kilogram of cocaine transported. CHS1 advised MEDINA sold "Chuy's Auto Sales" in 2019 because he believed law enforcement would be looking for him. CHS1 advised that MEDINA was now back (referring to the Tri-Cities area) and still engaged in drug trafficking. CHS1 advised that when MEDINA was in town (referring to the Tri-Cities area), he predominantly stayed with MEDINA's oldest daughter, identified as Vanessa MEDINA ("V. MEDINA") and

PLEA AGREEMENT - 6

boyfriend Roberto VALENCIA ("VALENCIA") at the Legacy Square Apartments. CHS1 advised MEDINA utilized multiple phone numbers.

CHS1 also identified MENDOZA as working for and being supplied drugs by MEDINA and advised that MEDINA was very close to Juan Cardenas VALDOVINOS ("VALDOVINOS") who lived in the Grandview, WA area and was a drug distributor with MEDINA. VALDOVINOS previously told CHS1 that he (VALDOVINOS) owed everything he had to MEDINA and called him "Don Chuy".

CHS1 advised that VALENCIA was working as part of the marijuana-side of the DTO in California and VALENCIA had been working for VALDOVINOS and was brought out to Washington for the purpose of working for the DTO.

*March 2023 Controlled Purchase from MEDINA*

In early March 2023, CHS1 contacted MEDINA to arrange a controlled purchase of a distribution-quantity of cocaine. MEDINA agreed to do so initially during an in-person meeting, and at that time, MEDINA told CHS1 to simply call him (MEDINA) when CHS1 was ready to purchase the cocaine. MEDINA offered to sell CHS1 kilogram-quantities of cocaine, but CHS1 told MEDINA he/she simply wanted the amount she/he ordered. On March 3, 2023, CHS1 placed a call to MEDINA, wherein based on the previous conversation, CHS1 simply stated he/she was "here" and "ready" and could head over if MEDINA wanted. MEDINA advised CHS1 to come by his apartment at Legacy Square Apartments. CHS1 went to the apartment, and surveillance agents positively identified CHS1 meeting with MEDINA. CHS1 ultimately purchased cocaine from MEDINA as confirmed via a video recording of the transaction.

*Tracking Warrants and Surveillance*

During this investigation, multiple tracking warrants were obtained, and GPS trackers subsequently installed on multiple vehicles utilized by this DTO. Multiple location records warrants were also obtained for cellular phones utilized by this DTO. A static surveillance camera was also installed overlooking the public area at the

PLEA AGREEMENT - 7

Legacy Square Apartments. Data from the various warrants showed these vehicles and cellular phones would frequently travel from the Legacy Square Apartments to "Delta Auto Sales", at 114 N. Oregon Ave in Pasco and then to VALDOVINOS' residence on Mountainview Road in Grandview, before returning to the Legacy Square Apartments. Data also showed that when making these trips, the vehicle would drove in patterns consistent with attempting to see if being followed (i.e. "heat checks"), such as making four rights turns consecutively, or making multiple consecutive U-Turns. Location records for MEDINA's cellular phone showed the phone went to California on several occasions as well as traveled to Mexico.

*May 2023 Shipment of Cocaine*

In early May 2023, CHS1 had an in-person meeting with MEDINA wherein MEDINA advised he would be getting more cocaine in the next several days and offered to sell more cocaine to CHS1. Based on context, the cocaine was anticipated to arrive on May 3 or May 4.

On May 3, 2023, MEDINA met with VALDOVINOS, and Moises VALENCIA-VALDOVINOS at a restaurant, then traveled to VALDOVINOS' residence. During the next 3 hours, several vehicles were observed coming and going from that residence. MEDINA was observed accessing the trunk of his vehicle, and then returned home several hours later. At approximately 10:01pm, MEDINA exited the apartment and accessed the trunk of his vehicle. At 10:04pm, MEDINA walked back towards the apartment with a white object, with hard edges that resembled a brick, in his right hand, consistent with a brick of cocaine.

The following day, May 4, 2023, MEDINA sent CHS1 a text "[h]ere at home I took the application so if you help me fill it out, when you want I'm ready, let me know." CHS1 explained text was in coded language in reference to having a supply of cocaine and "help me fill it out" was in reference to offering to sell it to CHS1. CHS1 had previously advised (and again confirmed) he/she and MEDINA did not

PLEA AGREEMENT - 8

have any legitimate business together or engage in any other activities which would require them to discuss any type of an application.

On May 11, 2023, MEDINA advised the CHS1 during an in-person meeting that he (MEDINA) was going to meet with someone regarding selling a "brick" of cocaine. Shortly after the meeting, MEDINA left the Legacy Square Apartments and traveled to Delta Auto Sales. An unknown male was observed at that location, pacing on a cell phone. After a short amount of time, MEDINA exited the location and left.

Over the next several days, MEDINA and VALENCIA engaged in conduct consistent with distributing cocaine. For example, on May 13, 2023, Defendant and an unknown male were at Delta Auto Sales and traveled to the Legacy Square Apartments. Once there, Defendant and the other male contacted another male in the parking lot and then entered another vehicle. That vehicle left the location and traveled to the alley behind drug customer Will Jovani GUARDADO's residence ("GUARADO") at 1716 W Court St #D. After about 10 minutes, the vehicle left the location and made multiple stops throughout the day at several locations, ultimately returning to the Legacy Square Apartments.

On May 14, 2023, VALENCIA left the apartment complex and traveled to the residential area of 440 N Sycamore St, Pasco, WA, in the Chevy Avalanche before returning to the complex. After VALENCIA entered the apartment, MEDINA and his mother walked to the Chevy Avalanche. MEDINA retrieved a red gym-type bag and placed it into the Nissan Altima. MEDINA took his mother to lunch and then traveled to Delta Auto Sales for approximately 20 minutes, before returning to the apartment complex. After those stops, VEHICLE 2 and MEDINA traveled back to Legacy Apartments. MEDINA then left the apartment complex, and returned approximately 30 minutes later, without the red gym bag.

Further, tracking data for the Chevy Avalanche and the Nissan Altima showed frequent travel to locations of drug customers, such as 1115 N. 7th in Pasco, the residence of Juan REYS and Edward LEMOS. Of note, after leaving this residence,

PLEA AGREEMENT - 9

the vehicles would engage in counter-surveillance techniques, consistent with the trip being illicit in nature.

*June 2023 Shipment of Cocaine,*
*Defendant's Trip to Atlanta, & MEDINA's Trip to Mexico*

On June 4, 2023, CHS1 observed MEDINA in possession of two "bricks" of cocaine in a blue and white cooler. MEDINA advised CHS1 that VALENCIA would be delivering a brick of cocaine to Connell, WA. MEDINA also advised that Defendant was flying to Atlanta, Georgia, but did not provide a reason for the trip.

The same day MEDINA exited the Legacy Square Apartments carrying a blue and white cooler. He accessed the Nissan Altima and opened the trunk. MEDINA then reached into the back passenger side of the vehicle consistent with placing an object into the passenger side panels of the trunk area. MEDINA closed then trunk and left the area on foot. A short time later, MEDINA returned to the vehicle and placed an item into the trunk, shut it, and returned to the apartment complex. A short time later, MEDINA returned to the Nissan Altima and removed the object and the blue and white cooler and returned to the apartment. MEDINA then exited the apartment carrying the blue and white cooler. He placed the cooler in the Nissan Altima and traveled to Delta Auto Sales. Throughout that same day, VALENCIA was observed coming and going from Legacy Apartments, consistent with ongoing drug-related activity.

On June 5, 2023, Defendant's Snapchat account "Carteezy24" made a "snap" wherein he tagged himself in Lilburn, Georgia. The snap showed Defendant behind the wheel of a Cadillac with the following text "Been a while since I seen my whip [car]". Washington Department of Licensing records showed Defendant had a 2016 Cadillac CTS registered to him out of Pasco. About 2 hours later, Defendant posted another "snap" showing him driving around with the tagged location of Lenox Square in Atlanta.

PLEA AGREEMENT - 10

On June 7, 2023, MENDOZA made a snap of a video of himself and Joel TORRES, a drug trafficking associate, at a Waffle House in Calvert City, Kentucky. The next day MENDOZA made a snap and tagged himself in Wood River, Nebraska with the text on the screen "Mission". The GPS was active on the center console of the vehicle. Several days later, CHS1 advised Defendant had returned from Atlanta in the Cadillac.

Around this time, CHS1 was present during a meeting at Delta Auto Sales between MEDINA and VALDOVINOS wherein the two (VALDOVINOS and MEDINA) discussed the fact they brought cocaine for several people to party with during this meeting. VALDOVINOS stated Defendant had been responsible for distributing 20 kilograms of cocaine in Atlanta and brought back the money on this trip. VALDOVINOS also stated MENDOZA wasted the money on a car and should have saved it. The United States would present evidence that Defendant showed up to the meeting and tried to negotiate a price per kilogram of cocaine with MEDINA. MEDINA agreed to send MENDOZA 8 kilograms. During the meeting, MEDINA also talked about sending VALENCIA to run drugs in Tennessee but determined VALENCIA was untrustworthy because he used too much cocaine. Defendant disputes that he was at this meeting.

On June 14, 2023, MEDINA and Moises VALENCIA traveled from the Tri-Cities area in the Chevy Avalanche to MEDINA's residence in Lucerne Valley, California. They then traveled into Mexico. Review of Facebook postings for Moises VALENCIA showed that between June 14-22, 2023, Moises VALENCIA and MEDINA were traveling through Las Vegas into Mexico and then returned to MEDINA'S home in Lucerne Valley, CA. Border Crossing records showed that MEDINA and Moise VALENCIA crossed into the United States on June 18, 2023, in a Toyota Tacoma.

During this time frame, the United States' evidence indicates VALENCIA and Defendant took care of supplying the customers. For example, on June 20, 2023,

PLEA AGREEMENT - 11

MENDOZA and VALENCIA met at the Legacy Square Apartments. A short time later, VALENCIA left in a silver Subaru and traveled to 1115 N. 7th in Pasco where he met with several individuals.

On June 25, 2023, MEDINA returned to the Legacy Square Apartment from his trip in the Toyota Tacoma. The next day, there were a variety of meetings between MEDINA, VALENCIA, and VALDOVINOS that occurred at Delta Auto Sales and VALDOVINOS' residence. In the evening, MEDINA walked from the area of the Toyota Tacoma vehicle carrying a large white bag and met with VALENCIA, who was in the driver's seat of the Nissan Altima. MEDINA handed the bag to VALENCIA, who then traveled to 1115 N. 7th in Pasco.

### Title III Interceptions & Continued Investigation

In early July 2023, MEDINA affirmed to CHS1 that MEDINA could provide cocaine to CHS1 at any time. Title III interception orders were obtained for MEDINA's cell phone as well as VALENCIA's cellphone, which covered the general timeframe of July 13, 2023 – September 7, 2023. During the Title III interception, there were several relevant calls that corroborated the activities and the individual's role within the DTO. The following are a few examples of those relevant interceptions, surveillance, and seizures.

### July 2023

### Re-Supply of Cocaine

In summary, in July 2023, MEDINA, VALENCIA, and VALDOVINOS brought cocaine back to the Tri-Cities area, which was then distributed by VALENCIA. VALENCIA left the proceeds from those sales for MEDINA at their shared residence.

On July 14, 2023, and continuing to July 15, 2023, MEDINA, VALDOVINOS, and VALENCIA traveled from MEDINA's Lucerne Valley residence to Washington. MEDINA and VALDOVINOS were in one vehicle and VALENCIA was in another vehicle. In the evening of July 15, 2023, VALENCIA arrived Legacy Square

PLEA AGREEMENT - 12

Apartment in a large truck that had not been observed previously. VALENCIA removed a large cooler from the back of the truck and placed it in the Cadillac Escalade. VALENCIA then left the location in the Cadillac and traveled to the residence at 1508 N 16th Ave in Pasco [also referred to in reports as a residence located at 7th and Octave]. VALENCIA left this location and traveled to a laundry mat. He then placed a 46 second call to a Mexico-based phone number. He then called Jose "Joey" GRACIA. He then traveled to a dirt road that led to a field where a semi-truck was parked. VALENCIA parked next to the semi-truck. Approximately 5 minutes later, VALENCIA left the area and returned to the Legacy Square Apartments. VALENCIA did not remove any cooler from the vehicle upon his return.

A short time later that same day, VALENCIA called MEDINA (Session 51). MEDINA advised he was with VALDOVINOS and he (MEDINA) would be leaving that location soon. VALDOVINOS then got on the phone with VALENCIA. During that conversation, VALENCIA referred to VALDOVINOS as "el patron" (meaning boss). A few minutes later, MEDINA called VALENCIA and advised that he (MEDINA) was on the way with VALENCIA's backpack. MEDINA asked what VALENCIA was doing and VALENCIA stated he was taking his girlfriend (Vanessa, MEDINA's daughter) to dinner. MEDINA asked when VALENCIA would be available as he (MEDINA) was on the way and to leave the item of interest there, as nothing was going to happen to it (*i.e.* it was in a secured location).

On July 16, 2023, VALENCIA called MEDINA and they discussed their activities for the next day, and VALENCIA indicated he would be working (Session 76). A short time later, VALENCA called MEDINA and VALENCIA advised that VALDOVINOS wanted the car, and MEDINA replied "tell him to talk to that dude Conejo. The coolers are down in there and I'm not taking them down until tomorrow." VALENCIA stated that he would tell him, and MEDINA replied "[n]ow he wants to drive, on a Sunday, that fucker" (Session 77).

PLEA AGREEMENT - 13

*Interaction with CONTRERAS*

On July 17, 2023, MEDINA and drug customer Ramon Flores CONTRERAS ("CONTRERAS") arranged an in-person meeting at MEDINA's residence (Session 111). MEDINA and CONTRERAS met in front of the Legacy Square Apartments in CONTRERAS' vehicle, a white Kia Optima. MEDINA entered the vehicle with a piece of white paper and when he exited the vehicle, MEDINA had a white paper that was folded, consistent with containing something received from CONTRERAS. CONTRERAS left the location. Following the meeting, CONTRERAS called MEDINA and attempted to clarify pricing. Two days later, on July 19, 2023, CONTRERAS went to Delta Auto Sales and obtained a tire from the trunk of car on the auto lot and left the area. CONTRERAS then drove to 5104 Tyler Ct in Pasco and removed the tire from the vehicle. CHS1 advised a common method of transportation of contraband for this group is in tires. Later that same day, CONTRERAS called MEDINA, who was in California, and said he (CONTRERAS) saw VALENCIA and tried to talk to him about pricing and supply; however, VALENCIA told him that he (CONTRERAS) would need to talk to MEDINA. MEDINA expressed concern as "the world is too hot" and CONTRERAS expressed he would not ask further at that time (Session 159). Several minutes later, MEDINA and VALENCIA spoke about CONTRERAS and his request to obtain drugs from VALENCIA (Session 161). MEDINA declined the request, expressing "it's too hot to dig".

*Meeting with MEDINA*

In late July, MEDINA asked CHS1 to meet him at Delta Auto Sales. MEDINA arrived at Delta Auto Sales in the red Nissan Altima and CHS1 arrived shortly after. They met at the outside gate of the property where MEDINA advised that he had just returned from California and had several bricks of cocaine available. They agreed to discuss this further at a later date. Once inside the gate, other individuals arrived, and a small bag of cocaine was removed from the Nissan Altima.

PLEA AGREEMENT - 14

MEDINA's mother passed on July 29, 2023. The days following, MEDINA was planning funeral arrangements in between calls pertinent to his drug trafficking activities.

### August 2023

### *Drug Sale to RAMIREZ*

On August 1, 2023, RAMIREZ called MEDINA (Session #636-638), and told MEDINA the mechanic called him and said he (the mechanic) had the opportunity for the "two cars" if you take them to him. MEDINA quickly ended the phone call by saying they would talk "there", later clarified to be Delta Auto Sales. MEDINA then called VALENCIA and advised RAMIREZ had called and was with GRACIA. A short time later, MEDINA and Defendant were on the porch area of Delta Auto Sales when RAMIREZ arrived and met with several individuals at the location. MEDINA ultimately left the location with his wife and daughter Vanessa, and they traveled to their new residence at 1914 W 45th Ave in Kennewick. Once there, MEDINA retrieved a weighted red bag from the Toyota Tacoma that was parked on the side of the residence, and placed the bag in the vehicle they arrived in. MEDINA was taken back to Delta Auto Sales by S. MEDINA where MEDINA walked into the location with the same weighted red bag. When MEDINA arrived, RAMIREZ and another male all went inside the office building. RAMIREZ and the male left the location, and MEDINA sat on the porch and no longer had the red bag. After RAMIREZ left the location, he engaged in counter-surveillance.

### *August 3, 2023 Seizure*

On August 3, 2023, MEDINA exited his Kennewick residence with a striped bag, which appeared to be full of white objects, and walked to the driver's side of the Toyota Tacoma. He placed the bag behind the driver's seat, then walked around to the passenger side of the vehicle and removed a flattened box or similar item that could cover interior items from exterior view. The item was then placed into the bed of the pickup. MEDINA then reached down into the vehicle several times before

PLEA AGREEMENT - 15

walking away from the passenger side carrying the same striped bag; however, the white objects had been removed. MEDINA locked the vehicle from the front driver side and walked back into the residence. A federal search warrant was applied for and granted for the Toyota Tacoma the same day. The search warrant provided permission to execute covertly and to delay any notice of the search warrant.

Shortly after 8pm that same day, the search warrant was executed and law enforcement located a zip-lock style bag with half a kilogram size brick of suspected cocaine, a full-sized kilogram sized brick of suspected cocaine, and a Crown Royal bag with $44,000 in bulk U.S. Currency, which were under the seats in storage compartments in the area MEDINA accessed earlier in the day.

On August 6, 2023, MEDINA and VALENCIA were at the Legacy Square Apartments and traveled in the Nissan Altima to Delta Auto Sales and then t 1115 N 7th Ave in Pasco, where they parked in an alley behind the location and MEDINA entered the unit to the right. A short time later, MEDINA walked out of the residence with two individuals. MEDINA and VALENCIA returned to Delta Auto Sales, where MEDINA obtained his red and white cooler and placed it in the Nissan Altima. MEDINA and VALENCIA then returned to the Legacy Square Apartments, where VALENCIA carried the cooler into the apartment building. MEDINA then traveled to VALDOVINOS' residence, where he, VALDOVINOS, and other were loading bags into his (MEDINA's) vehicle from a flatbed trailer parked at VALDOVINOS' residence.

In the early evening hours of that same day, MEDINA and his wife were moving/ loading bags into their Kennewick residence. MEDINA approached the Toyota Tacoma and notice the vehicle had been accessed. MEDINA searched the rear seats of the vehicle and then checked the same location of the vehicle more than once, consistent with a search for missing items. MEDINA checked the entire vehicle; however, focused on the area the cocaine and U.S. Currency were located in. MEDINA, his wife, and one of his daughters then contacted a neighbor. MEDINA

PLEA AGREEMENT - 16

then called his landlord and advised of the break in.  The landlord advised him to file a police report.  MEDINA did not.

The next day, MEDINA, VALDOVINOS, and Defendant met at Delta Auto Sales to discuss the theft.  MEDINA left for California shortly thereafter.

On August 10, 2023, VALDOVINOS and VALENCIA confronted Defendant and accused him of stealing the drugs and money from MEDINA's vehicle. MENDOZA, VALENCIA, VALDOVINOS, and an unknown male walked up to the Toyota Tacoma and looked around the vehicle for several minutes before walking into MEDINA's residence.  MEDINA called VALENCIA and advised that they were with MENDOZA at MEDINA's house.  VALENCIA relayed Defendant was providing contradictory information.  MEDINA asked if VALDOVINOS was there, and VALENCIA affirmed.  VALENCIA stated Defendant was acting like a fool and not showing any remorse.  MEDINA asked if the women were there, and VALENCIA stated they were picking up clothes.  MEDINA told VALENCIA to show him (Defendant) the video and VALENCIA said they did already.  MEDINA told VALENCIA to let MENDOZA know to return what he took and there will be no problem.  VALENCIA said MENDOZA did not want to take responsibility. MEDINA wanted to know how MENDOZA was buying phones and fixing cars. They discussed the trailer MENDOZA wanted to buy.  VALENCIA stated MENDOZA needed to return it, but he kept denying everything.  A short time later, MENDOZA, VALENCIA, VALDOVINOS, and the other male left the residence, as did MEDINA's wife and two of his daughters, leaving in separate vehicles.

MEDINA called VALENCIA and told VALENCIA to pass the phone to VALDOVINOS.  MENDOZA can be heard in the background denying stealing. MEDINA asked VALDOVINOS what the other guy is saying and to put him on speaker.  MEDINA told VALDOVINOS to tell MENDOZA that he needed to stop acting stupid and everyone knows it was him.  VALDOVINOS stated after reviewing the details it had to be him.  VALDOVINOS stated he would pass the phone to

PLEA AGREEMENT - 17

MENDOZA, and MENDOZA insisted he didn't do it and wouldn't have any reason to do it. In a subsequent call, MEDINA told VALENCIA to tell him (MENDOZA) they will not let him go until he brings it back. MEDINA said it's the same for the brother and VALENCIA confirmed.

A short time late, MEDINA called and asked for an update. VALENCIA stated MENDOZA was talking about selling his house to cover it if needed. MEDINA told VALENCIA to tell him (MENDOZA) that part of the money was to cover the funeral expenses for MEDINA's mother. MEDINA said to arrange a face-to-face call. Around this same time, VALDOVINOS, VALENCIA, MENDOZA, JIMENEZ, and RAMIREZ were at Delta Autos Sales. In a subsequent call, VALENCIA told MEDINA that stated he (MENDOZA) contradicted himself and was playing dumb. MEDINA stated it was a mockery that the day they were burying his mother MENDOZA was stealing what he was going to pay for the burial with. VALENCIA explained he told MENDOZA to tell him (VALENCIA) who it was and that would be it. VALENCIA added that MENDOZA continued to deny involvement, and MEDINA stated he will see what comes out.

A couple hours later, VALENCIA called MEDINA and MEDINA advised he was going to bed. VALENCIA advised nothing happened and MEDINA responded that he would see what comes out and VALENCIA said to just tell him yes or no. MEDINA said bye and VALENCIA repeated yes or no. MEDINA again said bye and VALENCIA again repeated yes or no. The call then ended. Surveillance observed MENDOZA at Delta Auto Sales and he appeared to be acting casually and drinking beer. He did not appear to be in any distress. Everyone dispersed a short time later.

After this event with MENDOZA, VALENCIA began to take on a greater role in soliciting customers and distributors for the organization. MENDOZA was not observed or intercepted. It was apparent he was laying low based upon the situation.

PLEA AGREEMENT - 18

*Execution of Search Warrant at Defendant's Residence &*
*Arrest of Defendant*

On August 18, 2023, federal search warrants were executed at MENDOZA's residence and on his person. MENDOZA was found to be in possession of a firearm. MENDOZA was arrested. In a post-*Miranda* interview, MENDOZA admitted to the possession of multiple firearms as well as his involvement in sale of firearms. During the interview, the FBI advised him of potential threats to him based on the intercepted communications. In response, MENDOZA claimed no knowledge of any threats and he also explicitly declined any law enforcement assistance. During the interview, MENDOZA admitted giving a "friend" (OLIVERA) a small amount of cocaine for another friend (MEDINA); however, to preserve the integrity of the ongoing investigation, he was not questioned about this DTO. MENDOZA has been detained since his arrest. Of note, conversations have been intercepted on TT1 discussing MENDOZA's arrest, to include MEDINA telling his son, Edgar MEDINA, that he had told MENDOZA not to carry a firearm because it would draw attention on August 19, 2023 (Session 1223).

After MENDOZA's arrest, members of the organization changed their patterns, indicating a concern about law enforcement involvement. For example, for a period of time, MEDINA and VALENCIA turned off their phones, VALDOVINOS was observed burying something at his property, and MEDINA did not leave his residence.

*Valencia*

On August 22, 2023, VALENCIA spoke to VALDOVINOS and advised he had customers in need of a supply of cocaine (Session #791). Over the next several days, VALENCIA engaged in multiple conversations with customers about selling them cocaine, which VALENCIA routinely referred to as "onions" (Session 862, 863, 865). VALENCIA then traveled to locations associated with those customers to deliver the orders and collect proceeds for those sales, which he provided to MEDINA.

PLEA AGREEMENT - 19

On August 26, 2023, MEDINA and VALDOVINOS met at VALDOVINOS' residence along with several other males. A vehicle with attached horse trailer was also present. They sat near the rear of several vehicles and a cooler was brought over. MEDINA and a younger male would occasionally adjust something on the horse trailer, but nothing was observed being removed from the trailer. MEDINA, VALDOVINOS and another male entered MEDINA's Chevrolet Avalanche. The unknown male exited, grabbed a white rectangular object off the ground from where they had been seated earlier that was consistent with a brick of cocaine, cradled it to his chest and brought it MEDINA's vehicle. Shortly after, MEDINA's left the area.

Later the same day, VALENCIA received a call (Session 992), and was asked to go to the building at 7th and Octave in Pasco. VALENCIA affirmed. He then traveled to Delta Auto Sales and left that location a few minutes later. VALENCIA then traveled to LOCATION 10. Upon arrival, VALENCIA walked toward VALDOVINOS and several other males with his shirt pulled up, exposing his waist. As VALENCIA got closer to VALDOVINOS, he lifted his right arm, which was holding the shirt up, to lower the shirt. VALENCIA walked past the two other males and greeted VALDOVINOS, and then greeted the other two. VALDOVINOS and VALENCIA began to speak. During the conversation, the two other males had VALENCIA surrounded as if he was not free to go . The two spoke for some time, the two unknown males formed a makeshift wall around VALDOVINOS (to his left and right) as he stood at the bumper of a white pickup track and leaned against his Jeep. They all appeared to be looking in various directions and VALDOVINOS brought out a small object out of his right pocket. VALDOVINOS brought it up to his nostrils approximately three times and then rubbed his nose. One of the two unidentified males then bent down towards the object and upon leaning up also grabbed his nose . VALDOVINOS took the object and appeared to pour the contents onto a piece of paper which he folded and put into his right pant pocket. Shortly after they left the location. VALENCIA then went to a customer's residence.

PLEA AGREEMENT - 20

*Execution of Federal Search Warrants*

In early September 2023, location information for VALDOVINOS' phone showed the phone was heading southeast across the United States. On September 7, 2023, the FBI executed multiple federal search warrants, to include a federal search warrant on VALDOVINOS' residence. On the morning of the execution, the location records for the device showed the device near the Florida – George state line.

During the execution of the search warrant, Valentin MADRIGAL Ayala ("MADRIGAL Ayala") was present at the VALDOVINOS' residence. In summary, MADRIGAL Ayala advised MEDINA returned from California recently, pulling a horse trailer, to the location. VALDOVINOS, MADRIGAL Ayala, and MEDINA brought MEDINA's car to another location in Grandview, where Reynalda ZAPIEN Madrigal ("ZAPIEN"), VALDOVINOS' wife, picked them up and brought them back to the residence.

MADRIGAL Ayala stated he was present when he, VALDOVINOS, and Cesar GUIZAR went to 7th and Octave in Pasco, Washington to collect a debt for $3,000-$4,000 from VALENCIA. MADRIGAL Ayala admitted that he and VALDOVINOS used cocaine in the street during the meeting that VALENCIA brought. MADRIGAL Ayala stated he understood what is going on, in reference to the distribution of cocaine, but stays out of it. MADRIGAL Ayala stated that he does not know where they store the cocaine and stated he sees it often when they (referring to those individuals) are together. MADRIGAL Ayala stated he did not know where VALDOVINOS or MEDINA were.

ZAPIEN was also interviewed. Initially, she denied being married to VALDOVINOS; however, she eventually admitted that she was married through the church to VALDOVINOS and VALDOVINOS was the father of her children. ZAPIEN advised she did not know where VALDOVINOS was, even though she had recently talked to him. ZAPIEN advised MEDINA was in trouble and she overheard VALDOVINOS and MEDINA state they were both in trouble. While MEDINA was

PLEA AGREEMENT - 21

at her house during the last weekend of August 2023, he talked about someone getting arrested, so they (VALDOVINOS and MEDINA) took off a couple days later. ZAPIEN stated VALDOVINOS kept two phones on his person.

During the execution of the search warrant on the main residence, searching agents located six cellular phones in the master bedroom. Three of the cellular phones were located on ZAPIEN's side of the bed and the three other phones were located on the other side, as well as a safe that contained approximately $8,900 in U.S. Currency. In the living room was a scale with white powder residue. In a safe located near the entrance to the main residence, searching agents located approximately $3,500 in U.S. currency, an Interarm .22 rifle, and two boxes of .380 auto ammunition. Shortly after the execution of the search warrant, location records showed VALDOVINOS' phone was turned off.

### VALDOVINOS Located in Arkansas

The day after the execution of the search warrants, the FBI learned of a separate investigation by the Cleveland FBI Office into Jesus ESCARENO ("ESCARENO") and had an active locations record warrant for ESCARENO's cellular phone. Telephone toll records showed ESCARENO's phone had been in contact with VALDOVINOS' phone previously. According to FBI Cleveland, location records for ESCARENO's cellular phone showed the phone was in area of Orlando, Florida, which was the approximate location of VALDOVINOS' cellular phone before it was turned off.

On September 13, 2023, Arkansas State Police ("ASP") Trooper Ana Escamilla conducted a traffic stop on the vehicle on Interstate 40 near Carlisle, Arkansas. Trooper Escamilla contacted the driver, ESCARENO, and stated the contact was for a traffic violation she had observed. Trooper Escamilla requested license, registration, and logbook from ESCARENO. ESCARENO asked if he could look in the sleeper portion for the paperwork, and as he did so, a male was observed lying down in the sleeper portion of the truck.

PLEA AGREEMENT - 22

ESCARENO located the requested paperwork and walked to the trooper's vehicle. ESCARENO was acting nervous with labored breathing. ESCARENO was questioned regarding his travel pattern and advised he was bringing a load of "onions" from Washington to Florida. ESCARENO stated after delivering the onions, he took a trip to Atlanta to look for another trailer before traveling back with an empty trailer towards Washington. ESCARENO stated he knew it would be odd traveling back with an empty trailer due to the cost of fuel but stated he would save money by not having cargo and he needed to get to his daughter for her birthday.

ESCARENO denied having any controlled substances on board and denied having bulk cash in the vehicle. ESCARENO was asked for consent to search the vehicle to which he stated, "you can search it if you have probable cause." Trooper Escamilla requested a K9 trained to detect the odor of controlled substances. Cabot Police Officer Alex Bratton and his K9 partner "Kastor", traveled to the location to assist. Officer Bratton and his K9 partner conducted an exterior sniff of the vehicle, and the K9 alerted to the odor of controlled substances coming from the vehicle. A probable cause search of the tractor was performed, and law enforcement discovered two large duffel bags filled with approximately $545,022 in U.S. currency in vacuum sealed bags along with several cellular phones. ESCARENO and VALDOVINOS both denied ownership of the currency and refused to sign a seizure form. ESCARENO was ultimately arrested for an obstruction charge.

During the stop, ESCARENO advised his passenger's name was "Juan" with a last name of something like "Valdovivy". ESCARENO became "extremely nervous" when asked about the passenger and when asked to repeat his name said it was "Francisco" and "Frank." Trooper Escamilla contacted the passenger and he identified himself as VALDOVNIOS. VALDOVINOS was then arrested on his federal arrest warrant.

PLEA AGREEMENT - 23

*Search of Seized Devices*

There were numerous devised seized and subsequently searched pursuant to the above referenced warrants. Once of those devices was a telephone seized from Defendant.

Upon execution of a search warrant for Defendant's device, there was a large volume of drug related conversation and images located on this device. This evidence corroborates Defendant's involvement in this overall conspiracy.

*Drug Seizures*

In this case, there were drugs seized from the earlier investigation into MEDINA and MENDOZA in 2018 and 2019. More specifically, seized from a traffic stop that occurred on September 13, 2018. Those are noted as FBI exhibits 1B1 (2009 grams of cocaine); 1B2 (2004 grams of cocaine); 1B3 (2008.5 grams of cocaine); 1B4 (2007.6 grams of cocaine); 1B5 (10003.7 grams of cocaine); 1B6 (1999.5 grams of cocaine); 1B7 (2011.9 grams cocaine); 1B8 (1996.8 grams of cocaine). Although the United States believes this seizure is reflective of the scope of this DTO, the United States does not seek to apply them as relevant conduct for this Defendant.

The following results have been received thus far relative to the seizures during the 2023 investigation: (1) FBI Exhibit 1B41 –110.5 grams of cocaine (controlled buy with MEDINA); (3) FBI Exhibit 1B44- 435.9 grams of cocaine; and (4) FBI Exhibit 1B45- 1005 grams of cocaine seized from MEDINA'S Toyota Tacoma. The parties agree and stipulate these amounts in addition to additional drug amounts captured during the recorded communications and evidence from Defendant's phone establish he was knowingly engaged in a conspiracy that was distributing more than 15 kilograms of cocaine but less than 50 kilograms of cocaine and these amounts were distributed by Defendant or others involved in the conspiracy.

PLEA AGREEMENT - 24

9.     The United States Agreements:

a.     *Dismissal of Counts*

The United States Attorney's Office for the Eastern District of Washington agrees that at the time of sentencing, the United States will move to dismiss Count 3 of the Superseding Indictment.

b.     *Not to File Additional Charges*:

The United States Attorney's Office for the Eastern District of Washington agrees not to bring additional charges against Defendant based on information in its possession at the time of this Plea Agreement that arise from conduct that is either charged in the Indictment or identified in discovery produced in this case, unless Defendant breaches this Plea Agreement before sentencing.

10.    United States Sentencing Guideline Calculations:

Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG" or "Guidelines") apply and that the Court will determine Defendant's advisory range at the time of sentencing, pursuant to the Guidelines. The United States and Defendant agree to the following Guidelines calculations:

a.     *Base Offense Level and Relevant Conduct*:

The parties agree and stipulate that more 15 Kilograms but less than 50 Kilograms of Cocaine was distributed in furtherance of the criminal activity jointly undertaken by the Defendant and his co-conspirators; this amount was within the scope of the Defendant's agreement; this amount was reasonably foreseeable to this Defendant in connection with the conspiracy; and this Defendant's relevant conduct for sentencing purposes should be calculated based upon this amount, pursuant to U.S.S.G. §1B1.3.

Therefore, the parties agree and stipulate that his base offense level is 32. *See* USSG §2D1.1(c)(2) and Commentary 8(b).

PLEA AGREEMENT - 25

b.    *Special Offense Characteristics:*

The parties agree and stipulate Defendant possessed firearms connected to the offense therefore, two additional points are added to his base offense level pursuant to USSG §2D1.1(b)(1).

The parties further agree Defendant is not eligible for application of the Safety Valve pursuant to 18 U.S.C. § 3553(f) and USSG §5C1.2 and the First Step Act as it applies to the application of the Safety Valve.

c.    *Role Adjustments*:

The United States and Defendant agree that no role adjustment should be applied.

d.    *Acceptance of Responsibility*:

The United States will recommend that Defendant receive a three-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a), (b), if Defendant does the following:

    i.    accepts this Plea Agreement;

    ii.    enters a guilty plea at the first Court hearing that takes place after the United States offers this Plea Agreement;

    iii.    demonstrates recognition and affirmative acceptance of Defendant's personal responsibility for Defendant's criminal conduct;

    iv.    provides complete and accurate information during the sentencing process; and

    v.    does not commit any obstructive conduct.

The United States and Defendant agree that at its option and on written notice to Defendant, the United States may elect not to recommend a reduction for acceptance of responsibility if, prior to the imposition of sentence, Defendant is charged with, or convicted of, any criminal offense, or if Defendant tests positive for any controlled substance.

PLEA AGREEMENT - 26

     e.   *No Other Agreements*:

The United States and Defendant have no other agreements regarding the Guidelines or the application of any Guidelines enhancements, departures, or variances. Defendant understands and acknowledges that the United States is free to make any sentencing arguments it sees fit, including arguments arising from Defendant's uncharged conduct, conduct set forth in charges that will be dismissed pursuant to this Agreement, and Defendant's relevant conduct.

     g.   *Criminal History*:

The United States and Defendant have made no agreement and make no representations as to Defendant's Criminal History Category, which shall be determined by the Court at sentencing after the Presentence Investigation Report is completed.

11. <u>Length of Incarceration</u>:

Defendant acknowledges that this Plea Agreement is entered pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) ("Rule 11(c)(1)(C)"). Pursuant to Rule 11(c)(1)(C), the parties agree to jointly recommend a sentence of 120 months in custody. Any sentence imposed in this matter is subject to the Rule 11 nature of the agreement and subject to the provisions as detailed in this plea agreement.

Although the United States and Defendant agree to make these recommendations to the Court pursuant to Rule 11(c)(1)(C), Defendant acknowledges that no promises of any type have been made to Defendant with respect to the sentence the Court will ultimately impose.

Defendant understands that Defendant may withdraw from this Plea Agreement if the Court imposes a term of imprisonment of greater than 120 months or indicates its intent to do so. Defendant also understands that the United States may withdraw from this Plea Agreement if the Court imposes a term of imprisonment of less than 120 months or indicates its intent to do so.

PLEA AGREEMENT - 27

The United States and Defendant acknowledge that the imposition of any fine, restitution, term or conditions of Supervised Release are not part of the Rule 11(c)(1)(C) nature of this Plea Agreement; that the United States and Defendant are free to make any recommendations they deem appropriate as to the imposition of fines, restitution, or conditions of Supervised Release; and that the Court will exercise its discretion in this regard.

The United States and Defendant acknowledge that the Court's decisions regarding the imposition of fines, restitution, term, or conditions of Supervised Release will not provide bases for Defendant to withdraw Defendant's guilty plea or withdraw from this Rule 11(c)(1)(C) Plea Agreement.

12.    Property Disposal

Defendant does not claim an interest in the below-listed firearm and does not oppose the firearm's disposal by destruction or return to a legitimate owner by the Federal Bureau of Investigation (FBI):

a Glock 19 9mm handgun bearing serial number ABPP961

Defendant agrees to hold all law enforcement and the United States, its agents, and its employees harmless from any claims whatsoever arising in connection with the seizure and disposal of any assets covered by this agreement.

Defendant waives any right he might otherwise have had to receive notice or a hearing with respect to any other action that FBI might take in its sole discretion to carry out the disposal of the firearm. Defendant's waiver includes, without limitation, all common law, statutory, and constitutional claims or challenges, on any grounds, arising at any time from, or relating to, the seizure and disposition of the firearm, including any such claim for attorney fees and litigation costs.

13.    Supervised Release:

The United States and Defendant each agree to recommend 5 years of supervised release. Defendant agrees that the Court's decision regarding the

PLEA AGREEMENT - 28

conditions of Defendant's Supervised Release is final and non-appealable; that is, even if Defendant is unhappy with the conditions of Supervised Release ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or any term of Supervised Release.

The United States and Defendant agree to recommend that in addition to the standard conditions of supervised release imposed in all cases in this District, the Court should also impose the following conditions:

(a). that Defendant participate and complete such drug testing and drug treatment programs as the Probation Officer directs, but not to exceed six non-treatment drug tests per month during the imposed term of supervised release;

(b). that Defendant's person, residence, office, vehicle, and belongings are subject to search at the direction of the Probation Officer;

(c). that Defendant have no contact with any identified witnesses or co-defendants in this cause number.

14.   Criminal Fine:

The United States and Defendant do not agree as to the imposition of any criminal fine and will argue that at the time of sentencing. Defendant acknowledges that the Court's decision regarding a fine is final and non-appealable; that is, even if Defendant is unhappy with a fine ordered by the Court, that will not be a basis for Defendant to withdraw Defendant's guilty plea, withdraw from this Plea Agreement, or appeal Defendant's conviction, sentence, or fine.

15.   Mandatory Special Penalty Assessment:

Defendant agrees to pay the $100 mandatory special penalty assessment ($100 per count of conviction), to the Clerk of Court for the Eastern District of Washington per count of conviction, at or before sentencing, pursuant to 18 U.S.C. § 3013.

PLEA AGREEMENT - 29

16. <u>Payments While Incarcerated:</u>

If Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, Defendant agrees to earn money toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

17. <u>Additional Violations of Law Can Void Plea Agreement:</u>

The United States and Defendant agree that the United States may, at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its sentencing recommendation if, prior to the imposition of sentence, Defendant is charged with or convicted of any criminal offense or tests positive for any controlled substance.

18. <u>Waiver of Appeal and Collateral Attack Rights:</u>

Defendant understands that Defendant has a limited right to appeal or challenge Defendant's conviction and the sentence imposed by the Court.

Defendant expressly waives all of Defendant's rights to appeal Defendant's conviction and the sentence the Court imposes.

Defendant also expressly waives Defendant's right to appeal any fine, term of supervised release, or restitution order imposed by the Court.

Defendant expressly waives the right to file any post-conviction motion attacking Defendant's conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based on ineffective assistance of counsel arising from information not now known by Defendant and which, in the exercise of due diligence, Defendant could not know by the time the Court imposes sentence.

Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack upon the conviction or sentence, including, but not limited to, writ of habeas corpus proceedings brought pursuant to 28 U.S.C. § 2255.

PLEA AGREEMENT - 30

19.  <u>Withdrawal or Vacatur of Defendant's Plea:</u>

Should Defendant successfully move to withdraw from this Plea Agreement or should Defendant's conviction be set aside, vacated, reversed, or dismissed under any circumstance, then:

   a.  this Plea Agreement shall become null and void;

   b.  the United States may prosecute Defendant on all available charges;

   c.  the United States may reinstate any counts that have been dismissed, have been superseded by the filing of another charging instrument, or were not charged because of this Plea Agreement; and

   d.  the United States may file any new charges that would otherwise be barred by this Plea Agreement.

The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.

Defendant agrees to waive any objections, motions, and/or defenses Defendant might have to the United States' decisions to seek, reinstate, or reinitiate charges if a count of conviction is withdrawn, set aside, vacated, reversed, or dismissed, including any claim that the United States has violated Double Jeopardy.

Defendant agrees not to raise any objections based on the passage of time, including but not limited to, alleged violations of any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

20.  <u>Integration Clause:</u>

The United States and Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and Defendant, and no other promises, agreements, or conditions exist between the United States and Defendant concerning the resolution of the case.

PLEA AGREEMENT - 31

This Plea Agreement is binding only on the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state, or local authorities.

The United States and Defendant agree that this Agreement cannot be modified except in a writing that is signed by the United States and Defendant.

<u>Approvals and Signatures</u>

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Richard R. Barker
Acting United States Attorney

*Stephanie Van Marter*                    05/20/25
Stephanie Van Marter                         Date
Assistant U.S. Attorney


_____                 _____
Caitlin Baunsgard                            Date
Assistant U.S. Attorney

I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. My attorney has advised me that by pleading guilty to the charges relevant to this Plea Agreement, as of this date deportation appears to be a virtual certainty. No other promises or inducements have been made to me, other than those contained in this Plea Agreement, and no one has threatened or forced me in any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

*Jose Mendoza Sanchez*                    5/20/25
JOSE CARLOS MENDOZA-SANCHEZ              Date
Defendant

PLEA AGREEMENT - 32

I have read the Plea Agreement and have discussed the contents of the Plea Agreement with Defendant.  The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties.  I have further advised my client by pleading guilty to the charges relevant to this Plea Agreement, as of this date deportation appears to be a virtual certainty.  I concur in Defendant's decision to plead guilty as set forth in the Plea Agreement.  There is no legal reason why the Court should not accept Defendant's plea of guilty.

_____     _5/20/25_____
Nick Mirr                       Date
Attorney for the Defendant

PLEA AGREEMENT - 33